# IN THE COURT OF APPEALS OF IOWA

No. 22-1147
Filed July 13, 2023

IN RE THE MARRIAGE OF BENJAMIN D. RIGDON
AND ALICIA S. RIGDON

Upon the Petition of
**BENJAMIN D. RIGDON,**
        Petitioner-Appellant,

And Concerning
**ALICIA S. RIGDON,**
        Respondent-Appellee.
_____

        Appeal from the Iowa District Court for Des Moines County,
Michael J. Schilling, Judge.


        A father appeals a district court ruling modifying physical care of his son.
**AFFIRMED.**


        Katie M. Naset of Hope Law Firm & Associates, P.C., West Des Moines, for
appellant.

        Mark R. Hinshaw, West Des Moines, for appellee.


        Considered by Bower, C.J., and Badding and Buller, JJ.

**BADDING, Judge.**

Benjamin (Ben) Rigdon and Alicia Rigdon are the parents of an extraordinary twelve-year-old child, who excels in school, sports, and cattle shows. When the parties divorced in 2016, the district court placed the child in Ben's physical care. In doing so, the court noted that but for Alicia's move to Georgia for work, "this is the type of case where shared physical care would be appropriate." In the summer of 2021, Alicia moved back to Iowa—just minutes away from Ben and the child. The district court granted her application to modify the dissolution decree, placing the child in the parties' joint physical care on an alternating-week schedule and adjusting child support. Ben appeals.

## I.      Background Facts and Proceedings

When Ben and Alicia got married in 2000, they were living in Missouri. They moved to Iowa in 2005, after Alicia graduated from law school and Ben graduated from college. Their child, L.R., was born in 2009.

After experiencing some difficulties in their marriage, Alicia accepted a job in New Jersey and moved there on her own in 2014, just as L.R. was starting preschool. She believed that Ben and L.R. would join her in New Jersey, but instead, Ben petitioned to dissolve their marriage. Meanwhile, Alicia left her job in New Jersey and obtained a new one in Georgia.

Both parties requested physical care at the dissolution trial. In its April 2016 decree, the district court placed the child in Ben's physical care. In doing so, the court found that

> [b]oth Alicia and Ben are completely capable of providing a healthy, nurturing home environment for [L.R.] Alicia was primarily responsible for doing so when the parties lived together. Ben has

been solely responsible for doing so since Alicia moved away from Iowa in the summer of 2014. With the parties living hundreds of miles apart, the court is forced to pick between one of the parties to have physical care of [L.R.] If the parties lived close to one another, this is the type of case where shared physical care would be appropriate. Because of the parties' choices and decisions, the court does not have that option.

Noting that L.R. was thriving at the time of trial "in the only home he has ever known," the court found physical care "boil[ed] down to the old adage: 'If it's not broken, don't fix it.'" So the court placed the child in Ben's physical care. Alicia had parenting time that was to include—at a minimum—one four-day weekend per school quarter, alternating holidays, all but three weeks of the summer, and any time she was in Iowa so long as she gave notice to Ben.

Alicia appealed the physical care decision, which a panel of this court affirmed. *See In re Marriage of Rigdon*, No. 16-0768, 2017 WL 362601, at *2 (Iowa Ct. App. Jan. 25, 2017). In doing so, we agreed with the district court that physical care with Ben in Iowa would provide the child "with the stability and continuity vital to [his] health and long-term maturity," while physical care with Alicia in Georgia "would disrupt the foundation of [his] support structure, namely his school, friends, caregiver, and familiar environment."[1] *Id.* at *3.

---

[1] Shortly after procedendo issued, the parties stipulated that the decree should be modified to include a provision about foreign travel with the child. Two years later, in May 2019, Alicia filed a contempt application against Ben, alleging that he violated her rights as a joint legal custodian by "unilaterally placing their child on a psychotropic medication" for his attention-deficit disorder. In a summary opinion, we affirmed the district court's denial of the application. *See generally In re Marriage of Rigdon*, No. 19-1497, 2020 WL 7868234 (Iowa Ct. App. Dec. 16, 2020).

In the years that followed, Alicia remained at her job in Georgia as assistant general counsel for a company that's based in California. Despite the distance between her home and L.R., Alicia exercised visitation "[a]t least every other weekend, sometimes three weekends a month," and "the entirety of every summer." Once the COVID-19 pandemic hit, Alicia was able to work remotely from Iowa temporarily. She lived with Ben's oldest daughter from his previous marriage and saw L.R. as much as Ben would allow. After the pandemic opened the door to remote work, Alicia was able to negotiate working remotely from Iowa full-time. She sold her house in Georgia and moved back to Iowa in July 2021. Alicia rented a home a couple of minutes away from L.R.'s school while she waited for the home that she is building on an acreage near Ben to be finished. She usually works from 7:00 a.m. until 3:00 p.m. Monday through Friday, although she testified that her schedule is flexible.

Alicia emailed Ben at the end of July, notifying him that she had moved back to Iowa and asking him to consider "50/50 visitation as long as we both live in the same school district." Ben refused, although he did agree that Alicia could pick L.R. up from school on Mondays, Tuesdays, and Wednesdays and keep him until 5:30 or 6:00 p.m. when he got off work. The parties also agreed that Alicia could have alternating weekends with L.R. Unhappy with this arrangement, Alicia petitioned to modify physical care in September, alleging that her "relocation to . . . Iowa constitutes a material and substantial change in circumstances since the entry of the decree" and seeking joint physical care of L.R. Ben answered, denying Alicia's allegations and asking for dismissal of her petition.

At the modification trial in March 2022, Ben described himself as a "status quo guy." He has been employed by an ordnance manufacturer as a warhead quality control engineer for seventeen years and lived in the same home for the same period of time. He works Monday through Thursday, usually leaving for work at 6:15 a.m. and getting home around 5:15 p.m. Debbie, the child's caregiver since he was a baby, comes to Ben's home in the morning and gets the child off to school on days when Ben has to work. Ben explained that he's done his best to accommodate Alicia since she moved back to Iowa, but he finds it difficult at times to bend to her will because he wants to keep L.R. in his normal routine, while Alicia does not prioritize the child's need for consistency.

In Ben's view, Alicia gets "to be the fun parent," while he has remained the "steady and stalwart" one, the parent who

> has to do the mundane tasks that the mule does. You know, the mule is not flashy. The mule is not fun, but the mule has to plow the row. He doesn't get to go to the racetrack. He doesn't get to go to the show, but he has a job to do, and he just has to put his head down, and do it, and that's the way I feel at times.

Ben expressed some resentment that Alicia decided to move back now that L.R. was twelve and needed less care, questioning: "[B]ecause it works out for you now, it's convenient for you now, I don't understand why we have to disrupt everything [L.R.] has known, everything that [L.R.] is used to just because you . . . show up in town." When asked on cross-examination whether it was "important to maximize the child's interactions with both parents," Ben responded: "I believe consistency, stability . . . are the hallmarks of any child's life. . . . Anything that is inconsistent, isn't stable, is to the detriment of [L.R.]" And Ben viewed Alicia's move to Iowa as disruptive to the consistency he had created for L.R.

Ben testified that the child "likes to get up at the same time every day. [L.R.] likes to eat the same thing three or four times a week. [L.R.] likes to go to bed at the same time almost every day." Alicia testified to the same, describing L.R. as "a creature of habit" like her: "I operate on a regular basis where I like to have the same schedule. Sometimes I like to eat the same things, so he's a lot like that, and so schedule consistency is something that I think is important, and I think Ben and I both agree on that."

Ben and Alicia also agreed that L.R. is, in Ben's words, a "spectacular" child. He does very well at school, even with his attention-deficit disorder and suspected dysgraphia—a condition that causes his brain to work faster than he can write or speak. And he participates in several activities on top of his cattle showing, including football, soccer, and most recently, trapshooting. Both parents support him with these activities. The record shows that L.R. likes spending time with each of them. And while each had some complaints about the other, Ben and Alicia acknowledged they were both good parents. Although they mainly communicate by email, aside from a few snappy exchanges, they are generally able to reach some sort of compromise at the end of the day.

Against this backdrop, the district court found that Alicia's relocation to Iowa was a permanent, substantial, and material change in circumstances that was not within the contemplation of the decretal court and that joint physical care was in the child's best interests. The court accordingly modified the decree to place the child in the parties' joint physical care on an alternating weekly basis, with a corresponding reduction to Alicia's child support obligation. Ben filed a motion to reconsider, enlarge, or amend, which the court denied. This appeal followed.

## II.     Standard of Review

An action to modify a decree of dissolution of marriage is an equitable proceeding, which we review de novo.  Iowa R. App. P. 6.907; *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015).  We give weight to the factual findings of the district court, especially when considering the credibility of witnesses, but we are not bound by them.  Iowa R. App. P. 6.904(3)(g).  The best interest of the child is our primary consideration.  Iowa R. App. P. 6.904(3)(o); *Hoffman*, 867 N.W.2d at 32.  "We will affirm unless the district court 'failed to substantial equity.'" *In re Marriage of Terrones*, No. 20-0538, 2020 WL 7021557, at *2 (Iowa Ct. App. Nov. 30, 2020) (citation omitted).

## III.     Analysis

### A.     Physical Care

"[O]nce custody has been fixed it should be disturbed for only the most cogent reasons."  *In re Marriage of Brown*, 778 N.W.2d 47, 52 (Iowa Ct. App. 2009).  Thus, a party seeking modification of physical care bears a heavy burden.  *In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983).  "When, as here, a parent is requesting a change from the other parent's physical care to their joint physical care, the requesting parent must show (1) a substantial change in circumstances occurred that necessitates the change and (2) joint physical care is in the child's best interests."  *Blair v. Beck*, No. 21-0933, 2022 WL 1100282, at *3 (Iowa Ct. App. Apr. 13, 2022).

#### 1.     Change in circumstances

The first prong involves a showing of a substantial change in circumstances since the decree, not contemplated by the court when the decree was entered,

which is more or less permanent and relates to the welfare of the child.  *See Terrones*, 2020 WL 7021557, at *2.

Ben claims Alicia did not meet her burden to show a substantial change in circumstances sufficient to warrant modification.  He points out that Alicia's parenting time under the original decree was broad and allowed her significant time with the child even though she lived in Georgia.  In Ben's view, "Alicia was permitted the frequency of parenting time that was not unlike a non-custodial parent residing much closer to the custodial parent than Alicia in fact did," so her move back to Iowa was not a meaningful change in circumstances.  Alicia responds that the large distance between the parties was the sole reason the decretal court did not award the parties joint physical care in the first place.

We agree with Alicia.  Unlike *Heusinkveld v. Schlecht*, the only case that Ben cites in support of his position, Alicia's move was not a "minor change in location."  No. 19-1132, 2020 WL 1049534, at *3 (Iowa Ct. App. Mar. 4, 2020) (finding that the noncustodial parent's move from forty miles away to within five minutes of the child's home with the custodial parent was not a substantial change in circumstances warranting modification).  Instead, her move spanned several hundred miles and multiple states.  The geographic distance between the parties was the circumstance that the decretal court said "forced [it] to pick between . . . the parties to have physical care."  We echoed this sentiment on Alicia's appeal from the dissolution decree.  *See Rigdon*, 2017 WL 362601, at *2 ("The geographical distance between the parties means joint physical care is not an option.").  The removal of that barrier to joint physical care serves, in this case, as a substantial change in circumstances that was not contemplated by the decretal

court. While Ben questioned the permanency of Alicia's residency in Iowa at the modification trial, we agree that Alicia showed the change is more or less permanent, since she is now allowed to work remotely and she is building a home here. Ben does not dispute that the change concerns the welfare of the child. We accordingly conclude this prong is satisfied.

### 2. Best interests

On the second prong, "because joint physical care essentially places the parents 'on equal footing,' the requesting parent need not prove an ability to provide superior care, as is required when one parent seeks to wrest physical care from the other." *Blair*, 2022 WL 1100282, at *3. Instead, when—as here—"both parents are suitable caregivers," the question of whether joint physical care is in a child's best interests involves consideration of the non-exclusive *Hansen* factors: "(1) stability and continuity of caregiving; (2) the ability of [the parents] to communicate and show mutual respect; (3) the degree of conflict between the parents; and (4) the degree to which [the] parents are in general agreement about their approach to daily matters." *Id.* (alterations in original) (citation omitted); *accord In re Marriage of Hansen*, 733 N.W.2d 683, 700 (Iowa 2007). We also consider the factors in Iowa Code section 598.41(3) and *In re Marriage of Winter*, 233 N.W.2d 165, 166 (Iowa 1974).[2]

---

[2] "Although Iowa Code section 598.41(3) does not directly apply to *physical care* decisions, . . . the factors listed here as well as other facts and circumstances are relevant in determining" physical care. *Hansen*, 733 N.W.2d at 696. The factors include whether each parent would be a suitable custodian, whether the child will suffer due to lack of active contact with and attention from both parents, whether the parents can effectively communicate about the child's needs, whether both parents have actively cared for the child, whether each parent can support the other's relationship with the child, whether one or both parents agree to or oppose

Ben's primary argument against joint physical care is the disruption he believes it will cause to the stability and continuity of caregiving he has provided to L.R. since Alicia's move to New Jersey in 2014. *See Hansen*, 733 N.W.2d at 696 (considering approximation when evaluating joint physical care because stability and continuity of caregiving are presumed to be in a child's best interests). While the child has spent most of his formative years in Ben's primary care, Alicia has not been an uninvolved parent. Instead, the record shows that she has been a steady and constant presence in L.R.'s life, despite her prior out-of-state residence. As Ben acknowledges, Alicia exercised substantial visitation with the child, regularly communicated with Ben and the child's providers about his educational and medical needs, and was an active participant in his extracurricular activities, even though she lived in Georgia. Since she moved back to Iowa, Alicia has had the ability to be even more involved.

Given Alicia's continuous and substantial involvement in the child's life, we find the approximation factor is not dispositive, even though it does weigh somewhat in Ben's favor because of how long the child, who is a creature of habit and enjoys consistency, has been in his care. *See In re Marriage of Kunkel*, 555 N.W.2d 250, 253 (Iowa Ct. App. 1996); *see also Hansen*, 733 N.W.2d at 697 (declining to give controlling weight to approximation factor because "our case law

---

joint physical care, and the geographic proximity of the parents. *See* Iowa Code § 598.41(3)(a)–(e), (g), (h). Courts also consider the characteristics of the child and parents, the child's needs and the parents' capacity and interests in meeting the same, the relationships between the parents and children, the effect of continuing or disrupting an existing physical-care child, the nature of each proposed environment, and any other relevant matter disclosed by the evidence. *See Winter*, 223 N.W.2d at 166–67.

requires a multi-factored test where no one criterion is determinative"). We agree with the district court's conclusion that both parents have been successful caregivers and allowing them "to provide a home for [the child] and share in his day to day care offers him the opportunity for the maximum amount of ongoing physical and emotional contact with both of his parents while not undercutting his emotional ties to" others.

Ben also relies on what he views as the parties' inability to communicate and show mutual respect, coupled with the degree of conflict between them. On these factors, the district court found "some evidence of hostility and perhaps lack of trust" but did "not consider these factors to be a significant impediment to co-parenting." Emails between the parties do show some parental discord but not anything pervasive, especially considering the amount of contact they needed to have to arrange Alicia's liberal out-of-state parenting time each year. *Cf. Terrones*, 2020 WL 7021557, at *3 (outlining the "ongoing bitterness" between the parties as shown by their fights over "the biggest and smallest" of concerns, like whether the child should wear a headband for a school picture). As both parents testified at trial, they are able to keep their disputes away from L.R. and arrive at a compromise in the end. Overall, the record shows they are able to communicate, respect one another, and avoid conflict above the usual acrimony between divorced parents.

As for the final *Hansen* factor—the parents' approach to daily matters—the district court found "the parties have been able to consistently agree on childcare, discipline, participation in extracurricular activities, the importance of regular contact with extended family, and other related issues, including counseling for

[the child]." While Ben asserts that his home is more "predictable and structured" in comparison to Alicia's, he did not provide any examples to support that assertion. And Alicia testified that she believes consistency and routine are just as important for the child as Ben does.

After considering all the relevant factors, we agree with the district court that modifying the physical-care arrangement to place L.R. in his parents' joint physical care "will maximize [his] physical, emotional, and social best interests." *See Hansen*, 633 N.W.2d at 695 ("The objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity."). As a result, we need not address Ben's child support claim on appeal, which is conditioned on him retaining physical care of the child.

### B.    Appellate Attorney Fees

Both parties request an award of appellate attorney fees. Neither pinpoints an amount, nor supported their request with a fee itemization. In any event, an award of appellate attorney fees is not a matter of right but rests within the appellate court's discretion. *In re Marriage of Berning*, 745 N.W.2d 90, 94 (Iowa Ct. App. 2007). After considering "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal," we conclude the parties should each pay their own attorney fees. *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005). The costs of this appeal are assessed to Ben.

### IV.    Conclusion

We affirm the district court's modification, concluding that Alicia's relocation was a sufficient change in circumstances and joint physical care is in this child's

best interests.  We do not consider Ben's child support claims, deny each party's request for attorney fees, and tax costs to Ben.

**AFFIRMED.**